## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MICHELLE BAGLEY; GARY MILLINE;  :
HAMILTON SMITH; MARCELLA      :
URBAN and other similarly situated   :
individuals,                         :

                         :        15 Civ. 4845 (FB)(CLP)

          Plaintiffs,     :

                         :

    -against-          :        **FIRST AMENDED**

                         :        **CLASS ACTION COMPLAINT**

THE NEW YORK STATE DEPARTMENT :
OF HEALTH , HOWARD ZUCKER,   :
COMMISSIONER OF THE NEW YORK :
STATE DEPARTMENT OF HEALTH, in  :
his official capacity, and VISITING NURSE:
ASSOCIATION HEALTH CARE     :
SERVICES, INC., d/b/a VNA of STATEN :
ISLAND,                        :

                         :

         Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

      Michelle Bagley, Gary Milline, Hamilton Smith, Marcella Urban, and Sharan

Harper (collectively, "Named Plaintiffs"), by and through their attorneys, Mobilization for

Justice, Inc. ("MFJ")[1] and Patterson Belknap Webb & Tyler LLP, bring this class action

complaint for declaratory and injunctive relief to challenge the acts and omissions of the New

York State Department of Health ("DOH"), Howard Zucker, the Commissioner of the DOH, in

his official capacity, and Visiting Nurse Association Health Care Services, Inc., d/b/a VNA of

Staten Island ("VNA") (collectively, "Defendants").

      Plaintiffs hereby allege as follows based on information and belief:

---

[1] Prior to June 2017, Mobilization for Justice, Inc., was MFY Legal Services, Inc.

**PRELIMINARY STATEMENT**

1.      This is a civil rights action.  The Named Plaintiffs seek relief on behalf of themselves and similarly situated individuals (collectively, "Plaintiffs") from Defendants' violations of their rights, privileges, and immunities secured by The Fourteenth Amendment to the United States Constitution; The Civil Rights Act of 1871, 42 U.S.C. § 1983; The Americans with Disabilities Act, 42 U.S.C. §§ 12117, 12132 *et seq.*, and its implementing regulations; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulations; and the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, and its implementing regulations.

2.      Named Plaintiffs are current or former residents of New York City nursing homes.  They all want and are able to live in the community with appropriate home- and community-based Medicaid services.  The Nursing Home Transition and Diversion ("NHTD") waiver program is supposed to provide those services and supports.  But for Defendants' failure to design and administer New York's Medicaid Plan in accordance with federal law and regulations, Named Plaintiffs would be able to maintain their dignity and independence by safely receiving the care that they need through home- and community-based Medicaid services.

3.      Named Plaintiff Michelle Bagley, who is forty-eight years old, has been trying to access the NHTD waiver and return to the community since January 2014.  When Ms. Bagley applied for the waiver, she received a boilerplate denial letter that did not inform her of the reason for her denial or her right to a fair hearing.  Ms. Bagley learned of her right to a fair hearing only when she consulted with an attorney.  Months later, a week before her fair hearing, Defendant VNA verbally informed Ms. Bagley's attorney that she was found ineligible because of an alleged history of outbursts—a reason wholly outside of the eligibility criteria of the program—but would be allowed to participate in the program if "she behave[d]."  Defendant VNA granted Ms. Bagley probable eligibility to the program ten months after her application.

For almost three additional years, Ms. Bagley was forced to remain in the nursing home because of Defendants' failure to reasonably administer the NHTD waiver program. When service coordinators failed to find her housing, Ms. Bagley found an apartment herself, which came with its own housing subsidy and personal care services. Ms. Bagley moved out of the nursing home to this apartment in August 2017.

4.   Named Plaintiff Gary Milline, who is sixty-six years old, has also been trying to access the NHTD waiver and return to the community since January 2014. During his intake interview, Defendant VNA incorrectly informed him that his prior criminal history might affect his eligibility and then sent him the same boilerplate denial letter that they sent to Ms. Bagley. Like Ms. Bagley, Mr. Milline was in fact found ineligible based on a reason wholly outside of the eligibility criteria of the program; in his case, his prior criminal history. Mr. Milline learned of his right to a fair hearing only when he consulted with an attorney. After Mr. Milline requested a fair hearing, Defendant VNA reassessed Mr. Milline and granted him probable eligibility to the program. Nineteen months after his application and almost a year after VNA found him preliminarily eligible, Mr. Milline is still waiting to access the NHTD waiver and return to the community. For almost three additional years, Mr. Milline was forced to remain in the nursing home because of Defendants' failure to reasonably administer the NHTD waiver program. When service coordinators failed to find him housing, Mr. Milline found an apartment himself, which came with its own housing subsidy and personal care services. Mr. Milline moved out of the nursing home to this apartment in August 2017.

5.   Named Plaintiff Hamilton Smith, who is forty-seven years old, has been trying to access the NHTD waiver and return to the community since September 2012. Defendant VNA granted Mr. Smith probable eligibility in October 2012. After ignoring his

repeated requests for assistance over the course of two years, Defendant VNA closed Mr. Smith's case and told him that he had to reapply.  When Mr. Smith reapplied, Defendant VNA took another eight months to schedule a preliminary intake meeting and then verbally denied him assistance based on a reason outside of the NHTD waiver program's eligibility criteria. Approximately one month later, VNA returned to re-assess Mr. Smith and, subsequently, reversed its verbal denial.  However, almost *six years* after his initial application in 2012, Mr. Smith is still waiting to access the NHTD waiver and return to the community.

6.    Named Plaintiff Marcella Urban, who is seventy-one years old, has been trying to access the NHTD waiver and return to the community since Spring 2014.  Defendant VNA granted Ms. Urban probable eligibility soon after her application.  However, over four years later, Ms. Urban is still waiting to access the NHTD waiver and return to the community.

7.    Named Plaintiff Sharan Harper, who is sixty-seven years old, has been trying to access the NHTD waiver and return to the community since October 2016.  Ms. Harper never received a notice regarding her probable eligibility decision, but at her intake interview, Defendant VNA gave her the name of a service coordinator to contact to proceed.  That service coordinator was unresponsive, and Ms. Harper spent months trying to find a service coordinator to take her case, keeping Defendant VNA apprised of her efforts.  After nearly a year of searching, Ms. Harper located and enrolled with a service coordinator, only to be told by Defendant VNA that her case had been closed because she had taken too long to find a service coordinator, even though she had never received notice of this decision.  When Ms. Harper resubmitted her application and signed new forms with Defendant VNA, she received a call from Defendant VNA saying that she was ineligible for the program because she was enrolled in a Medicaid Managed Long-Term Care Plan, contrary to Defendant VNA's previous instructions.

4

This call was followed by a written letter from Defendant VNA, not on letterhead, informing her of her ineligibility and referring her to a different housing program.  The notice provided no information about her appeal rights.  Soon after, Ms. Harper was copied on a message from Defendant VNA to her chosen service coordinator, indicating that they had agreed to take her case.  Ms. Harper responded seeking clarification, but has not received any answers from Defendant VNA.  Nearly two years later, Ms. Harper is still waiting to access the NHTD waiver and return to the community.

8.    Named Plaintiffs are not alone in their inability to leave the unnecessary isolation of a nursing facility.  According to one 2010 study, nearly 10% of New York's nursing home population can dress, eat, walk, and use the toilet independently.  *Independence Among U.S. Nursing Home Residents*, NPR (Nov. 8, 2010), *available at* http://www.npr.org/templates/ story/story.php?storyId=131081906.  These individuals often can receive needed medical care in the community, with appropriate support, and yet they remain trapped in facilities that cut them off from their friends and families and rob them of their independence.

9.    One need only hear individuals describe what it means to avoid unnecessary institutionalization in a nursing home to understand the importance of reliable access to home- and community-based services:

- "My spirits would drop if I went to a nursing home . . . There's no place like home."  *A Shift from Nursing Homes to Managed Care at Home*, N.Y. Times (Feb. 23, 2012), *available at* https://www.nytimes.com/2012/02/24/nyregion/managed-care-keeps-the-frail-out-of-nursing-homes.html.

- "A home means to me where you are not in prison." *At 88, A Chance To Be Independent Again*, NPR (July 18, 2011), *available at* http://www.npr.org/ 2011/07/18/138158827/at-88-a-chance-to-be-independent-again.

- "Home means family.  Home means friends.  Home means happiness.  Home means joy." *A New Civil Right Looks for Stronger Enforcement*, NPR (Dec. 3, 2010), *available at* http://www.npr.org/2010/12/03/131786390/a-new-civil-right-lacks-enforcement.

10.     Beyond the emotional impact of having the chance to remain in their communities, studies have shown that individuals who receive home-based care receive better quality care, require fewer hospitalizations, are more satisfied with the care they receive, and show greater improvement in their ability to perform the activities of daily living.  Leff et al., *Comparison of Function Outcomes Associated with Hospital at Home Care and Traditional Acute Hospital Care*, 57 J. Am. Geriatrics Soc'y 273 (Feb. 2009); Counsell et al., *Geriatric Care Management for Low-Income Seniors:  A Randomized Controlled Trial*, 298 J. Am. Med. Ass'n 2623 (Dec. 12, 2007); Leff et al., *Satisfaction with Hospital at Home Care*, 54 J. Am. Geriatrics Soc'y 1355 (Sept. 2006).

11.     Additionally, the expansion of home- and community-based services can lead to a reduction of institutional spending and to long-term cost savings for taxpayers.  Kaye et al., *Do Noninstitutional Long-Term Care Services Reduce Medicaid Spending?*, 28 Health Affairs 262 (2009).

12.     As early as the 1980s, Congress recognized that recipients of long-term care under Medicaid would benefit from receiving services in a more integrated environment and that Medicaid services could be provided in a more cost-efficient manner outside of

6

institutionalized settings.  Congress reiterated this commitment to community integration by mandating that individuals with disabilities should have access to public benefits in the most integrated setting appropriate to their needs.

13.    In order to achieve this goal, Congress permitted states to develop home- and community-based services waiver programs to administer their Medicaid plans in more integrated settings.  New York purports to take advantage of this waiver by developing the NHTD Medicaid waiver program, which aims to move nursing home residents back into their communities by providing them with necessary home- and community-based supports.  In New York City, Defendant VNA administers this program on behalf of Defendant DOH.

14.    Although the NHTD waiver program was intended to achieve a worthy goal, in practice, Defendants have designed a program with Byzantine application procedures that are nearly impossible to navigate.  Individuals wishing to apply for benefits through the program must coordinate with multiple agencies and institutions, without assistance, to complete a multi-tiered application process, all from the isolation of their nursing homes.

15.    These structural barriers to the receipt of benefits are further compounded by Defendants' failure to properly administer the waiver program.  Defendants have failed to provide Plaintiffs with adequate notice and an opportunity to be heard with respect to eligibility determinations for the NHTD waiver program.  Defendants have also failed to ensure that there are adequate resources to serve the population of eligible applicants to the program in New York City, and as a result, Plaintiffs who are eligible to receive NHTD waiver services have been left languishing in nursing homes unnecessarily, without any recourse to challenge the inability of the NHTD waiver program to meet their needs.  Indeed, Defendant VNA has acknowledged that

in recent years it has had backlogs of more than a thousand referrals, which Defendant DOH has called "significant."

16. With this lawsuit, Plaintiffs seek declaratory and injunctive relief to redress the violation of their constitutional and statutory rights in connection with Defendants' administration of the NHTD waiver program.

## JURISDICTION AND VENUE

17. This action arises under, among other things, the Constitution and laws of the United States, including: The Fourteenth Amendment to the United States Constitution and The Civil Rights Act of 1871, 42 U.S.C. § 1983; The Americans with Disabilities Act, 42 U.S.C. §§ 12117, 12132 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and The Medicaid Act, 42 U.S.C. § 1396 *et seq.*

18. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), because this action seeks redress for the violations of Plaintiffs' federal constitutional and statutory civil rights.

19. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)–(d).

## PARTIES

20. Plaintiffs are current and future applicants to the NHTD waiver program who have been or will be denied access to benefits under that program without due process of law and in violation of the Fourteenth Amendment to the United States Constitution, the Medicaid Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

21. Additional facts regarding the Named Plaintiffs are set forth below at paragraphs 101 through 179.

8

22.     Defendant DOH is an agency of the State of New York that licenses, supervises, and enforces the laws and regulations applicable to nursing homes, and is responsible for protecting the rights of nursing home residents.  Defendant DOH administers New York's Medicaid program, including the NHTD Medicaid waiver program, and supervises the Regional Resource Development Centers ("RRDC") that manage the day-to-day operations of the program, including the RRDC run by Defendant VNA.  Defendant DOH is a public entity covered by the Americans with Disabilities Act.  *See* 42 U.S.C. § 12131(1).  It is a program of state government and a recipient of federal funds.

23.     Defendant Howard Zucker is the Commissioner of Defendant DOH.  Defendant Zucker is responsible for administering New York's Medicaid program, including the NHTD Medicaid waiver program, and for supervising the RRDCs, including the RRDC run by Defendant VNA, in their administration of the NHTD program.  He is sued in his official capacity.

24.     Defendant VNA is a New York not-for-profit corporation and has its principal place of business at 400 Lake Avenue, Staten Island, New York.  It is a Certified Home Health Agency and Long Term Health Care Provider regulated by Defendant DOH.  Defendant VNA is responsible for running the RRDC that administers the NHTD waiver program for the residents of New York City.  Upon information and belief, Defendant VNA is a recipient of federal funds.

## LEGAL AND STATUTORY FRAMEWORK

**The Fourteenth Amendment to the United States Constitution**

25.     The Fourteenth Amendment to the United States Constitution requires that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S.

9

Const. amend. XIV.  Persons who are eligible to receive benefits such as Medicaid have a legitimate claim of entitlement to such benefits, and as such, have due process rights with respect to their receipt of these benefits.  *Goldberg v. Kelly*, 397 U.S. 254, 261–62 (1970).

26.    When Medicaid applicants are denied Medicaid benefits, or have their medical assistance authorization or services discontinued, suspended, or reduced, federal law and regulations require timely and adequate notice to individuals regarding such actions.  Federal law and regulations also require that a state's Medicaid program must provide Medicaid applicants and recipients an opportunity for an administrative fair hearing when Medicaid benefits are denied, reduced, or terminated.  42 U.S.C. § 1396(a)(3); 42 C.F.R. §§ 435.912, 435.919, 431.210, 431.220.  Such a fair hearing must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970).  42 C.F.R. § 431.205(d).

**The Americans with Disabilities Act and the Rehabilitation Act**

27.    Title II of the Americans with Disabilities Act ("ADA")  and its implementing regulations:  (1) prohibit public entities from discriminating against individuals with disabilities; (2) require public entities  to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities"; and (3) dictate that public entities must provide reasonable accommodations that would allow individuals with disabilities to access public services.  42 U.S.C. §§ 12131–32; 28 C.F.R. § 35.130(a) and (b)(7).

28.    Section 504 of the Rehabilitation Act and its implementing regulations: (1) prohibit entities that receive federal financial assistance from discriminating against individuals with disabilities; and (2) require entities that receive federal financial assistance to "administer

10

programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 29 U.S.C. § 794; 28 C.F.R. § 41.51(d).

29.     In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the United States Supreme Court recognized that "unjustified isolation . . . is properly regarded as discrimination based on disability," and that a private right of action exists for failure to place an individual in the most integrated setting appropriate to his or her needs.

**The Medicaid Act**

30.     Medicaid is a joint federal-state program established under Title XIX of the Social Security Act (the "Medicaid Act"), which provides federal funding for state programs that furnish medical assistance, rehabilitation, and other services to needy individuals. 42 U.S.C. § 1396 *et seq.*; 42 C.F.R. § 430 *et seq.*

31.     States are not required to participate in the Medicaid program, but if they do, their state programs must conform to federal law and regulations in order to qualify for federal financial participation. 42 U.S.C. §§ 1396, 1396a, 1396c.

32.     Any state participating in the Medicaid program must adopt an approved "State Plan," and must administer the program through a "single state agency." 42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 430.10, 431.10(b)(1).

33.     A State Plan is an official document that describes the nature and scope of a state's Medicaid program. The Plan dictates the policies and procedures that a state will follow in administering the Medicaid program, including, *inter alia*, those related to the methods of administration, eligibility criteria, and covered services. 42 U.S.C. § 1396a; 42 C.F.R. § 430.10.

11

34.    New York has elected to participate in the Medicaid program, and the single state agency responsible for the administration of the Medicaid program in New York is Defendant DOH.  N.Y. Soc. Serv. § 363-a(1).

35.    Defendant DOH charges the local departments of social services ("LDSS") with implementing the Medicaid program.  In addition, New York State issues and updates guidance documents, specifically, Administrative Directives and General Information System messages, as needed, to provide ongoing guidance regarding the administration of New York's Medicaid program.

36.    Pursuant to the Medicaid Act and consistent with the Fourteenth Amendment, a state's Medicaid program must "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8).  This provision confers on eligible individuals a federal right to receive benefits that may be enforced in an action brought pursuant to 42 U.S.C. § 1983.  *M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 428 (S.D.N.Y. 2006); *Alexander A. v. Novello*, 201 F.R.D. 27, 35 (E.D.N.Y. 2002).

**Medicaid Waivers**

37.    With the Omnibus Reconciliation Act ("OBRA") of 1981, Congress enacted Section 1915(c) of the Social Security Act, which established Home- and Community-Based Services ("HCBS") Waivers for the Medicaid program.  42 U.S.C. § 1396n.  Through HCBS waiver programs, states can provide Medicaid-financed home- and community-based services to targeted populations, such as people with disabilities, as an alternative to institutional

care in nursing homes. Such services permit individuals to live in the most integrated environment possible while allowing states to provide more cost-efficient Medicaid services.

38. Section 1915(c) waiver programs are expected to be cost-neutral, and states are permitted to impose enrollment caps on their HCBS waiver programs in order to control expenditure growth. Section 1915(c) identifies services that are considered to be home- and community-based services within the meaning of the statute, and provides that the Secretary of Health and Human Services may approve additional services needed to avoid institutionalization. Within these parameters, states have broad discretion in developing their HCBS waiver programs.

39. States wishing to take advantage of section 1915(c) can submit a waiver program plan for approval to the Centers for Medicare & Medicaid Services ("CMS"). CMS, with its grant of approval, waives mandatory requirements that apply to Medicaid "State Plan" services. CMS approves waiver plans for an initial three-year term, and states may apply for an unlimited number of five-year extensions thereafter.

40. CMS has approved New York's applications for nearly a dozen HCBS waiver programs pursuant to section 1915(c). The NHTD waiver program is one such program. Social Services Law Section 366(6-a) authorized the Commissioner of the DOH to apply to CMS for "a nursing facility transition and diversion Medicaid waiver" to provide a community-based alternative to Medicaid eligible seniors and individuals with disabilities who are at least eighteen years of age and need a nursing home level of care. New York State Dep't of Health, Administrative Directive 08 OLTC / ADM – 1 (April 28, 2008), § II at 3 (*available at* http://www.health.ny.gov/health_care/medicaid/publications/docs/adm/08oltcadm-1.pdf).

**FACTUAL ALLEGATIONS**

13

**New York's Nursing Home Transition and Diversion Waiver**

41.    CMS first approved New York's plan for the NHTD waiver program on July 30, 2007, and the program currently operates under a five-year renewal extension of approval effective July 1, 2018.

42.    New York has set an enrollment cap on the NHTD waiver program.  In the renewal application in place at the start of this action, New York stated that the enrollment cap for the final year of the application period—September 1, 2014 to August 31, 2015—would be 4,200.  New York Nursing Home Transition and Diversion Medicaid Waiver Program Renewal Application, at 21–22 (*available at* https://www.health.ny.gov/facilities/long_term_care/docs/home_and_community-based_services_waiver.pdf).  On information and belief, enrollment in the NHTD waiver program never approached the enrollment cap in this renewal application.

43.    Since then, New York has reduced enrollment capacity by hundreds because enrollment in the program never reached the caps articulated in the earlier renewal application.  New York's failure to enroll applicants for which it had capacity evidences the poor design and administration of the NHTD waiver program and the resulting difficulty that individuals face in accessing benefits.  In the 2018 renewal application it submitted to CMS, New York stated that the enrollment cap for Year 5 of the application period would be 3,576. New York Nursing Home Transition and Diversion Medicaid Waiver Program Renewal Application, at 29–30 (*available at* https://www.health.ny.gov/health_care/medicaid/redesign/mrt90/docs/2018-07-12_1915c.pdf). The most recent NHTD waiver program statistics published by Defendant DOH indicate that there were 2,427 individuals enrolled in the NHTD waiver program in 2016 and 2,435 in 2017, a

14

net increase of 8 individuals.  New York State's 1915(c) Waiver Transition to Managed Care

Stakeholder Workgroup Presentation on Nursing Home Transition and Diversion (NHTD) and

Traumatic Brain Injury (TBI), April 11, 2018, at 13 (*available at*

https://www.health.ny.gov/health_care/medicaid/redesign/mrt90/meetings/docs/2018-04-

11_presentation.pdf).  Upon information and belief, the number of eligible individuals currently

enrolled in the program still does not exceed the enrollment cap and there are open spots

available for new applicants.

44.    The goal of the NHTD waiver program is to assist such individuals with

successful integration into the community, either by transitioning out of nursing homes or by

preventing institutionalization altogether.

45.    Through the NHTD waiver program, New York uses Medicaid funding to

provide services such as home-delivered meals, environmental modifications (including ramps,

bars, and doorway modifications), moving and transition assistance (including the payment of

security deposits, brokers fees, and the cost of essential furniture), home visits by medical

personnel, independent living skills training, community integration counseling, and wellness

counseling for eligible individuals.

46.    New York developed the NHTD waiver program "based on the

philosophy that individuals with disabilities and/or seniors have the same rights as others.  This

includes the right to be in control of their lives, encounter and manage risks and learn from their

experiences. . . . Waiver participant satisfaction is a significant measure of success of the NHTD

waiver."  New York State Dep't of Health, Nursing Home Transition and Diversion Medicaid

Waiver Program Manual (hereinafter "NHTD Waiver Program Manual") (2008), § I at 1

(*available at* https://www.health.ny.gov/facilities/long_term_care/waiver/nhtd_manual/nhtd_

program_manual_with_forms.pdf).

47.    These lofty goals notwithstanding, the structure of the NHTD waiver program and the intricacies of its application process seem as though they are designed to ensure that very few individuals will be able to receive benefits through the program and that none of the Defendants will be held responsible for this failure.

### The Structure of the Program

48.    The DOH contracts with private entities to administer the NHTD waiver program.  The state is divided into nine regions, with the NHTD waiver program being run in each region by an RRDC.  The RRDCs are run by private entities pursuant to contracts with the state.  "Each RRDC administers the NHTD waiver program initiatives at the regional level under the direction of the DOH waiver management staff.  The RRDC is responsible for managing the waiver program with an emphasis on ensuring patient choice, availability of waiver service providers, and cost effectiveness of waiver services within its contracted region."  *Id.* § IV at 1.

49.    Specifically, the RRDC will:

- "Employ [a Regional Resource Development Specialist], [Nurse Evaluator], and other staff who meet the qualifications and experience specified in its contract";

- "Function as an initial point-of-contact for potential applicants, their families, legal guardians, and/or authorized representatives";

- "Administer the day-to-day activities of the waiver and make recommendations based on such activities to DOH for improvements to NHTD waiver policies and procedures";

- "Develop and maintain waiver resources and supports in the contracted region";

- Manage the Service Plan review process, regional budgeting requirements, and other monitoring functions . . .";

- "Maintain Applicant Packets, [Service Plans], reports and other required documentation specified by the NHTD waiver";

16

- "Develop collaborative relationships with regionally based stakeholders including Local Departments of Social Services and other local government entities, providers, advocacy organizations and others necessary to assure a comprehensive coordinated approach to the targeted population"; and

- "Reduce the incidence of unnecessary institutionalization through . . . assisting eligible individuals currently living in nursing homes to move to appropriate community-based settings . . . [and] preventing in-state and out-of-state facility placements through individual and systems advocacy and through the development of needed supports for eligible individuals . . . ."

*Id.* § IV at 1–3.

50.    Each RRDC must employ a Regional Resource Development Specialist ("RRDS") who is directly responsible for managing and monitoring the day-to-day operations of the NHTD waiver program on a regional level.  The RRDS works closely with Defendant DOH to raise awareness about the program and to develop community-based resources to support it. The RRDS also manages provider enrollment and training, conducts preliminary assessments of potential waiver participants, reviews all service plans for approval, administers notices of decision, maintains regional budgets, provides technical support to providers and participants, and submits quarterly and annual reports to Defendant DOH regarding the status of the NHTD waiver program.

51.    In addition to employing an RRDS, RRDCs must employ, either directly or through contract, a Nurse Evaluator ("NE") who is a registered nurse.  The NE assists the RRDS in the performance of his or her duties.

52.    Defendant DOH contracts with three regional Quality Management Specialists ("QMS") who are separate from the RRDCs and who report directly to the DOH waiver management staff.  The QMS is responsible for quality control of the NHTD waiver program and oversees the incident reporting and quality monitoring processes on behalf of Defendant DOH.

53.     Finally, Defendant DOH retains ultimate responsibility for overseeing the NHTD Medicaid waiver program through the DOH waiver management staff.

54.     Under this structure, Defendant DOH, which has the ultimate responsibility for administering the state's Medicaid Plan, is completely divorced from the day-to-day management of the NHTD waiver program and is several steps removed from any quality assurance process that could potentially remedy any problems with its administration.  This bureaucratic separation allows Defendant VNA to improperly administer the program without oversight by Defendant DOH.

### *The Nursing Home Transition and Diversion Housing Subsidy*

55.     In conjunction with the NHTD Medicaid waiver program, Defendant DOH administers the NHTD Housing Subsidy in partnership with the New York State Department of Homes & Community Renewal ("DHCR").  This program provides rental subsidies to eligible NHTD waiver applicants to ensure that they can secure housing for their transition into the community through the waiver program.  The subsidy is funded entirely by state appropriations and is not funded by New York's Medicaid program.

56.     Defendant DOH and the DHCR contract with Local Authorities ("LA") in each NHTD waiver region to manage the day-to-day administration of the housing subsidy program.  The LA assists the Service Coordinator with housing issues in connection with a waiver participant's service plan.  The LA is responsible for inspecting and approving an applicant's proposed housing and for contracting with the owner of the housing to make rental payments on behalf of the applicant once an application for subsidized housing is approved.

57.     Although the NHTD housing subsidy program was designed to fill an important gap in the NHTD waiver program—namely, to finance independent living

18

arrangements for waiver program participants—the addition of a parallel program that must operate in connection with the waiver program further complicates the successful administration of the NHTD waiver program.

### *Eligibility Criteria*

58.    In order to be eligible to participate in the NHTD Medicaid waiver program an individual must satisfy each of the following criteria:

- The applicant must be a recipient of Medicaid coverage that supports community-based long-term care services;

- The applicant must be between the age of eighteen and sixty-four with a physical disability, or must be age sixty-five or older upon his or her application to the waiver program;

- The applicant must be assessed to need a nursing home level of care;

- The applicant must sign the Freedom of Choice form indicating that he or she chooses to participate in the NHTD waiver;

- The applicant must complete and submit an application packet, which includes the Initial Service Plan ("ISP"), in cooperation with the Service Coordinator[2];

- Included in the ISP, the applicant must be able to identify the actual location and living arrangements in which he or she will be living when participating in the waiver;

- The applicant must have a completed plan for protective oversight and be capable of directing his or her Service Plan[3];

- The services agreed upon in the applicant's ISP must meet regional and statewide cost neutrality; and

- The applicant must be able to live in the community where health and welfare can be maintained as determined by the RRDS.

---

[2] The Service Coordinator functions as an applicant's advocate with respect to the NHTD waiver program.  Service Coordinators assist applicants with the application and enrollment process and supervise the provision of services to applicants.

[3] The Service Coordinator works with an applicant to develop an individualized Service Plan, which sets forth the specific home- and community-based services the applicant will receive through the NHTD waiver program, such as wellness counseling, meal deliveries, and environmental modifications.

59.     In order to be eligible to participate in the NHTD housing subsidy an individual must satisfy each of the following criteria:

- The applicant must be referred to the NHTD housing subsidy program by their Service Coordinator and approved by an authorized RRDS; and,

- The applicant must be in receipt of services under the NHTD waiver program.

### *The Application Process*

60.     In addition to designing a multi-tiered bureaucracy to administer the NHTD waiver program, Defendants have implemented a complicated, multi-step application process that compounds the barriers applicants face when seeking benefits through this program.

61.     To initiate the application process, an individual wishing to apply to the NHTD waiver program must contact the RRDC in the region in which he or she currently resides or wishes to reside, either directly or through an individual working on his or her behalf.

62.     The RRDS will complete a referral form and make a determination as to whether to proceed to the intake process.  If the RRDS determines that the individual does not meet the basic requirements for the program, the RRDS will provide available options for referrals to other programs.  The RRDS must provide these alternate referrals within two business days of the determination not to proceed to intake.  Otherwise, the RRDS must contact the individual to schedule an intake interview within two weeks of the initial referral.  Contrary to federal constitutional and statutory requirements, if the RRDS determines that the individual is not eligible, the NHTD Waiver Program Manual does not require the RRDS to inform the individual of the reasons for this decision or that he or she has a right to appeal.

63.     The RRDS then performs an initial interview with the individual and his or her legal guardian.  Based on this intake meeting, the RRDS makes a preliminary determination of the individual's probable eligibility for the waiver program.  If the RRDS

20

determines that the individual is not eligible, the RRDS will provide available options for referrals to other programs and closes the intake process. Although the renewal application that New York submitted to CMS expressly states that individuals must be informed of their right to a fair hearing at the initial face-to-face intake meeting, the NHTD Waiver Program Manual, in contravention of federal constitutional and statutory requirements, does not require the RRDS to inform the individual of the reasons for this decision or that he or she has a right to appeal.

64.     If the RRDS determines that the individual is eligible, the individual completes and signs an application for participation form and a freedom of choice form verifying his or her desire to live in the community.

65.     Upon determining that an individual is eligible, the RRDS provides the individual with a list of approved Service Coordinators. The individual must select a Service Coordinator from this approved list. The Service Coordinator then notifies the RRDS that it is willing and able to accept the individual. If the individual's chosen Service Coordinator is unable to accept an individual into its program, the RRDS will notify the individual and the individual must select a new Service Coordinator.

66.     Once an individual selects and is accepted by a Service Coordinator, only then does he or she become a formal applicant to the NHTD waiver program. The applicant works with his or her Service Coordinator to develop an ISP and complete the formal NHTD application packet. Service Coordinators must complete the application packet within sixty days of accepting an applicant.

67.     As a part of the formal application packet, the Service Coordinator assists the applicants in locating housing in the community. Once the Service Coordinator has located accessible housing, he or she submits a Request for Tenancy Approval ("RFTA") to the LA.

21

When the LA receives the RFTA, the LA conducts an initial household interview with the waiver applicant, the Service Coordinator, and the RRDS to determine the applicant's housing needs. The LA inspects the desired housing, and once the housing is approved, the LA coordinates the payment of the rental subsidy to the owner of the housing.

68.    Once the RRDS is in receipt of the completed application packet, he or she has fourteen calendar days to review the packet and make a determination as to whether or not to approve the application.

69.    The RRDS informs the applicant of this determination by sending a formal notice of decision.  The notice of decision is a written document that notifies the waiver applicant or participant of the action being taken by the waiver program, including the reasons for the action.  Notices of decision are sent to inform waiver applicants and participants of the approval of their application for services, the denial of their application for services, and the reduction or discontinuation of their waiver services.  The RRDS is responsible for ensuring that the appropriate notice of decision has been completed and sent to the applicant and his or her legal guardian and service coordinator.  The Service Coordinator will follow up with the applicant to discuss the reasons for the notice of decision and the applicant's rights to challenge the decision.

70.    Individuals who receive a notice of decision relating to the NHTD waiver program are eligible for an informal conference and/or a fair hearing.  All notices of decision must include information regarding an individual's right to an informal conference and/or fair hearing and must explain how to pursue these rights.

71.    An informal conference is an opportunity for the applicant and his or her legal guardian to review the reasons for the notice of decision with the RRDS and address any

22

concerns the applicant might have with that decision. An applicant can pursue an informal conference in addition to a fair hearing, and anyone involved in the development of the applicant's ISP can request such a conference.

72.     A fair hearing is a hearing held before an administrative law judge ("ALJ") from the New York State Office of Temporary and Disability Assistance ("OTDA"). The ALJ hears arguments from applicants who wish to appeal the notices of decision issued by the RRDS. Issues including, but not limited to, whether the decision to deny, discontinue, reduce, or eliminate NHTD waiver services was correct may be decided through the fair hearing process. The fair hearing may not address, however, the issues of whether the applicant was in need of a nursing home level of care, whether the waiver had openings based on the enrollment cap, and whether the applicant has evidence of a physical disability or is over the age of sixty-five.

73.     Within ninety days of the hearing, the OTDA will issue a final decision to Defendant DOH and the individual. The RRDS must notify the Service Coordinator of the outcome of the hearing so that appropriate follow-up can occur.

74.     Thus, even if the application process were perfectly administered, it would still require members of an isolated community to act independently to coordinate with multiple agencies over an extended period of time in order to receive services through the NHTD waiver program. Unfortunately for Plaintiffs, Defendants' administration of the program has only served to complicate this process further.

**The Administration of the NHTD Medicaid Waiver Program in New York City**

75.     Since 2010, Defendant VNA has run the RRDC serving the residents of New York City pursuant to a contract with Defendant DOH.

23

76.    Defendants DOH and VNA have failed to administer the NHTD waiver program in accordance with state and federal law.

77.    Defendants have failed to ensure that the NHTD waiver program has adequate resources to provide a timely response to applicants.  Defendants have also failed to provide adequate written notice when applicants are denied eligibility to apply to the program, and adequately to inform applicants of their right to an informal conference and/or a fair hearing to challenge this decision.  And Defendants have failed to ensure that there is an adequate number of Service Coordinators in the New York City region to serve eligible applicants and that eligible applicants have access to adequate integrated housing opportunities to effectuate their transition into the community.  As a result, Plaintiffs' constitutional and statutory rights have been and will continue to be violated.

### *Inadequate Resources at Intake*

78.    Defendants have wholly failed to maintain adequate resources to provide a timely response to applicants.

79.    Even as Defendant DOH formally requires that RRDSs contact applicants to schedule an intake within two weeks of referral, Defendant VNA has experienced delays of more than nine months.

80.    Indeed, quarterly and monthly reports show that Defendant VNA consistently had hundreds of open cases that had not proceeded past the initial referral stage.

81.    This backlog prompted Defendant DOH on multiple occasions, including in 2012 and again in 2015, to specifically request that Defendant VNA focus its resources on clearing its referral backlogs.  Defendant VNA did not heed those requests, and Defendant DOH allowed the problems to continue.

*Lack of Notice*

82.     Defendants repeatedly fail to issue sufficient and timely written notice to applicants of the eligibility determination that occurs after the in-person interview with the RRDS.

83.     In some cases, as its current RRDSs have acknowledged, Defendant VNA fails to provide any notice whatsoever to applicants or their legal guardians of the outcome of their interviews.

84.     In others, again as its RRDSs have acknowledged, Defendant VNA has provided informal oral notice to an applicant's social worker, nursing home, or legal representative, rather than providing formal written notice to the applicant him- or herself.

85.     When Defendant VNA does provide written notice of an eligibility determination after an intake interview, it is a form letter that does not set forth the reasoning for the decision, and is therefore insufficient to permit the applicant to mount a meaningful challenge to the denial of benefits, even as Defendant VNA bases its decisions on factors that have no bearing on the eligibility criteria for participation.

86.     Upon information and belief, all applicants who are denied eligibility after the in-person interview and receive written notification receive the same form letter.

87.     In addition to these defects, the form letter fails to inform individuals that they have the right to an informal conference and/or a fair hearing to challenge their eligibility determinations and contains no information regarding the procedure for pursuing such a conference or hearing.

88.     When individuals who have been found probably eligible to apply to the NHTD waiver program are unable to locate a Service Coordinator to complete their application

packets in a certain amount of time, Defendant VNA revokes their eligibility status without any notice whatsoever. These individuals are forced to begin the application process all over again without any opportunity to challenge the revocation of their eligibility to participate in the program.

89. There is no procedure for such a revocation in the NHTD Waiver Program Manual drafted by Defendant DOH.

90. However, Defendant VNA has arbitrarily set a deadline after which eligibility determinations expire. This deadline is not explained to potential applicants.

91. By failing to provide adequate notice and an opportunity to be heard with respect to eligibility determinations, Defendants have deprived Plaintiffs of their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

*Additional Barriers to Program Access*

92. Even after successful completion of the in-person interview, NHTD Waiver applicants continue to face barriers to accessing the program and often remain trapped in nursing homes despite their eligibility to receive home- and community-based services.

93. For example, Defendant VNA is responsible for maintaining a list of approved Service Coordinators and providing this list to applicants who have been found to be preliminarily eligible for the waiver program. Defendant VNA fails to provide this information to waiver applicants consistently, leaving those who do not receive it unable to complete the application process.

94. Furthermore, the contact information on the list for many of the Service Coordinators, who experience a high level of turnover, is frequently out of date.

95.     The few Service Coordinators that applicants are able to reach do not have sufficient room in their programs to meet the needs of all applicants.

96.     Because a waiver applicant cannot complete his or her ISP and formal application packet until he or she has located a Service Coordinator, the lack of sufficient approved Service Coordinators leaves waiver applicants in a permanent state of limbo.  While the RRDS has made a preliminary determination that they are eligible to receive home- and community-based services, and they have expressed a preference for those services, they cannot complete the process to receive benefits through the NHTD waiver program and remain unnecessarily institutionalized.  Despite their awareness of these issues, Defendants have failed to take remedial measures to ensure that there are sufficient Service Coordinators for the community.  This results in a de facto denial of benefits to these qualified individuals that they are unable to challenge through any formal fair hearing procedure.  As Defendant VNA's employee recognized, "The process is not able to move forward," and the applicant, while eligible, is not "technically" an NHTD participant.

97.     If an individual finds a Service Coordinator, it can take years for the Service Coordinator to complete an ISP and have it approved by VNA.  In the meantime, qualified applicants languish in nursing homes.

98.     Defendants have also failed to ensure there are sufficient integrated housing opportunities to meet the needs of eligible waiver applicants.  This also results in a de facto denial of benefits to these qualified individuals that they are unable to challenge through any formal fair hearing procedure.

99. Although, upon information and belief, New York has many open spots in its NHTD waiver program, in the New York City region, these and other barriers prevent qualified waiver applicants from accessing the NHTD program.

100. By failing to eliminate these barriers to program access, Defendants have violated Plaintiffs' right under the Medicaid Act to receive medical assistance with reasonable promptness, and their rights to receive public benefits in the most integrated setting appropriate to their needs pursuant to the ADA and Section 504 of the Rehabilitation Act.

## FACTUAL ALLEGATIONS ABOUT NAMED PLAINTIFFS

**Michelle Bagley**

101. Michelle Bagley is a forty-eight-year-old former resident of Terrace Healthcare Center ("THC") in the Bronx, New York. THC is a skilled nursing facility that provides palliative, restorative, and long-term care to its residents. Ms. Bagley lived at Terrace Healthcare Center for approximately eight years, almost half of which she spent trying to access services through the NHTD waiver program.

102. Ms. Bagley is legally blind and has diabetes and renal insufficiency. She went to THC after her difficulty self-administering medication caused an accidental drug overdose.

103. Due to her disabilities, Ms. Bagley requires assistance with activities of daily living, like administration of her medication and insulin, cleaning, traveling, and shopping.

104. Ms. Bagley now successfully lives in the community with appropriate home- and community-based services, such as assistance with organizing and dispensing her medications, cleaning, traveling, and shopping.

105. Ms. Bagley first sought assistance from MFJ with transitioning into the community in January 2014. She and an MFJ employee met with representatives of her nursing

28

home to discuss her potential transition shortly thereafter.  As a result of this meeting, a representative of New York's Money Follows the Person Federal Rebalancing Demonstration Program ("MFP") met with Ms. Bagley and completed an NHTD waiver program referral form on her behalf.

106.    In April 2014, Ms. Bagley had her intake appointment with Defendant VNA to determine her eligibility for the NHTD waiver program.  Approximately two weeks later, Defendant VNA sent a letter to THC informing the nursing home that Ms. Bagley's "request for services through the Nursing Home Transition and Diversion Program ha[d] been denied."

107.    The letter stated simply:  "After careful review and assessment of all your medical records, we have determined that your needs and welfare cannot be met with the services offered from the Nursing Home Transition and Diversion Program."  It gave no other explanation for the finding that would have allowed Ms. Bagley to challenge that determination in a fair hearing.  The letter also failed to inform Ms. Bagley of her right to a fair hearing or the procedures for requesting such a hearing.  The nursing home shared this letter with Ms. Bagley and MFJ.

108.    It was only from MFJ that Ms. Bagley learned of her right to request a fair hearing to appeal her denial of eligibility.  With MFJ's assistance, Ms. Bagley filed a request for a fair hearing in June 2014.

109.    In July 2014, Defendant VNA verbally informed MFJ that Ms. Bagley was ineligible for the NHTD waiver program because she had an alleged history of angry outbursts.  Defendant VNA did not cite any of the eligibility criteria listed in the NHTD Waiver

29

Program Manual when explaining its determination. Defendant VNA agreed, however, to reevaluate Ms. Bagley's eligibility to participate in the waiver program.

110.    On July 13, 2014, Defendant VNA performed a second intake interview with Ms. Bagley. By July 30, 2014, Defendant VNA still had not notified Ms. Bagley of its decision as to her initial eligibility to participate in the NHTD waiver program.

111.    In July 2014, Defendant VNA informed MFJ that Ms. Bagley should proceed with her requested fair hearing. Ms. Bagley did so, and the hearing was adjourned until October 30, 2014.

112.    On October 21, 2014, a week before her hearing was to take place, Defendant VNA contacted MFJ and stated that Ms. Bagley could participate in the NHTD waiver program "if she behave[d]."

113.    Defendant VNA sent MFJ a list of Service Coordinators and a set of application forms, which MFJ forwarded on to Ms. Bagley. Shortly thereafter, Ms. Bagley began contacting Service Coordinators to start the process of applying to receive benefits through the waiver program. Ms. Bagley left voice mails with two Service Coordinators but did not receive calls back. Around November 2014, Ms. Bagley found a Service Coordinator.

114.    After her first service coordinator failed to locate a suitable apartment and declined to pursue options she suggested, Ms. Bagley found her own housing option, changed service coordinators, and moved to the residence she found in August 2017. Ms. Bagley has finally begun to receive some services through the NHTD waiver.

**Gary Milline**

115.    Gary Milline is a sixty-six-year-old who also lived at THC. He arrived at the nursing home approximately eight years ago for rehabilitation of an injury that left him paralyzed from the waist down. After rehabilitation, Mr. Milline continues to have weakness in

30

his legs, but can now walk short distances with a cane and two leg braces.  Mr. Milline also has permanent limited use of his right arm and limited use of his left arm and hand.

116.    Due to his disabilities, Mr. Milline needs assistance with activities of daily living, such as lifting items, walking, and using stairs.

117.    Mr. Milline now lives in the community with appropriate home- and community-based services.

118.    Mr. Milline first sought assistance from MFJ with transitioning into the community at the same time as his friend Ms. Bagley—in January 2014.  He and an MFJ employee met with representatives of THC to discuss his potential transition shortly thereafter. As a result of this meeting, a representative of MFP met with Mr. Milline and completed an NHTD waiver program referral form on his behalf.

119.    In April 2014, Mr. Milline had his intake appointment with Defendant VNA to determine his eligibility for the NHTD waiver program.  During the intake interview, Defendant VNA incorrectly informed Mr. Milline that his prior criminal record might affect his eligibility determination.  Approximately two weeks later, Defendant VNA sent a form letter to THC informing the nursing home that Mr. Milline's "request for services through the Nursing Home Transition and Diversion Program ha[d] been denied."

120.    The letter stated simply:  "After careful review and assessment of all your medical records, we have determined that your needs and welfare cannot be met with the services offered from the Nursing Home Transition and Diversion Program."  It gave no other explanation for the finding that would have allowed Mr. Milline to challenge that determination in a fair hearing.  The letter also failed to inform Mr. Milline of his right to a fair hearing or the

procedures for requesting such a hearing.  The nursing home shared this letter with Mr. Milline and MFJ.

121.    It was only from MFJ that Mr. Milline learned of his right to request a fair hearing to appeal his denial of eligibility.  With MFJ's assistance, Mr. Milline filed a request for a fair hearing in June 2014.

122.    After Mr. Milline requested a fair hearing, Defendant VNA agreed to re-evaluate his eligibility for the program.  On July 16, 2014, Defendant VNA conducted a second intake interview, at which time Defendant VNA informed Mr. Milline that his criminal history would not be determinative of his eligibility to receive services through the NHTD waiver program.

123.    On August 12, 2014, Defendant VNA contacted MFJ and explained that Mr. Milline did not need to move forward with his requested fair hearing because Defendant VNA had determined that he was eligible for the waiver program.

124.    Despite its determination that Mr. Milline was eligible to participate in the NHTD program, Defendant VNA failed to provide him with a list of approved Service Coordinators.  Mr. Milline had to rely on MFJ to provide him with that information.

125.    Shortly after MFJ mailed Mr. Milline the Service Coordinator contact information, he began contacting service coordination agencies to start the process of applying to receive benefits through the waiver program.  He left voice mails with two Service Coordinators but did not receive calls back.  Around November 2014, he found a Service Coordinator.

126.    After his first service coordinator failed to locate a suitable apartment and declined to pursue options he suggested, Mr. Milline changed Service Coordinators, found his own housing option, and moved to the residence he found in August 2017, three years after

Defendant VNA's eventual determination that he was preliminarily eligible.  Mr. Milline has finally begun to receive some services through the NHTD waiver.

**Hamilton Smith**

127.    Hamilton Smith is a forty-seven-year-old resident of Split Rock Rehabilitation and Health Care Center ("Split Rock"), a nursing home in the Bronx, New York where he has resided for approximately seven years.  Mr. Smith was discharged to Split Rock by Montefiore Medical Center after he received medical treatment for an abdominal illness.

128.    Mr. Smith uses a wheelchair.  He has been diagnosed with congestive heart failure, deep vein thrombosis, diabetes, morbid obesity, hypertension, asthma, and sleep apnea.

129.    Due to his disability, Mr. Smith needs assistance with activities of daily living, such as bathing, using the bathroom, transferring in and out of his wheelchair, cleaning, and cooking.

130.    Mr. Smith would like to live in the community and could do so with the appropriate home- and community-based supports.

131.    Mr. Smith first learned of the NHTD waiver program through a social worker at Split Rock.  In September 2012, the social worker contacted the RRDS at Defendant VNA on Mr. Smith's behalf to initiate his application to the waiver program.  The RRDS failed to schedule an intake interview with Mr. Smith within the two-week deadline set forth in the NHTD Waiver Program Manual.  It was not until four to six weeks later that the RRDS performed Mr. Smith's intake interview.

132.    During the assessment, the RRDS informed Mr. Smith that he was probably eligible to participate in the NHTD waiver program and provided him with a list of

33

Service Coordinator organizations.  The RRDS explained that the Service Coordinator would assist him in developing an ISP and completing a formal application for benefits.

133.    Mr. Smith inquired as to whether Defendant VNA could assist him in locating a Service Coordinator.  The RRDS responded that it would not.

134.    Mr. Smith contacted many of the approved agencies in an attempt to locate a Service Coordinator.  However, much of the contact information on the Defendant VNA-provided list was out of date or inaccurate.

135.    The few agencies that Mr. Smith reached informed him that their programs were closed to new applicants.

136.    Eventually, Mr. Smith contacted Federation Employment and Guidance Services ("FEGS") and another Service Coordinator organization.  Both programs indicated that they would provide service coordination services to him.  Mr. Smith relayed this information to Defendant VNA.

137.    In January 2013, Defendant VNA contacted Mr. Smith and advised him that FEGS and the other organization had no space available in their programs because their resources were being redirected to Hurricane Sandy relief efforts.

138.    Mr. Smith asked Defendant VNA to assist him in locating a new Service Coordinator, explaining that he had had great difficulty with the process previously.  In addition, Mr. Smith requested that Defendant VNA provide him with an updated contact list of approved service providers.  Defendant VNA did not respond to Mr. Smith's repeated requests for assistance.

139.    In September 2014, having received no response from Defendant VNA for more than a year, Mr. Smith contacted Defendant VNA again and requested a status update on

34

his case.  Defendant VNA informed Mr. Smith that due to the amount of time that had passed since his initial approval for NHTD waiver services, Defendant VNA had closed his case and he needed to reapply.

140.    Before this phone call, which Mr. Smith himself initiated, Mr. Smith had not received any notice from Defendant VNA that his probable eligibility had expired. Defendant VNA also failed to inform Mr. Smith of his right to a fair hearing to contest the revocation of his initial eligibility determination.

141.    When Mr. Smith attempted to begin the reapplication process during this same phone call, Defendant VNA refused to process his request and informed Mr. Smith that his social worker at Split Rock would need to refer him to the waiver program again.

142.    In September or October 2014, Mr. Smith reapplied to the NHTD waiver program.  Defendant VNA failed to schedule the intake within the required two-week timeline. Over eight months later, Defendant VNA scheduled the interview for July 2, 2015.  After a cursory assessment on the date of the interview, the RRDS informed Mr. Smith that he was ineligible for NHTD waiver services.  Confused and upset by the RRDS' seemingly hasty determination, Mr. Smith inquired why he was no longer eligible for services that Defendant VNA found him eligible for in 2012.  The RRDS responded that Mr. Smith did not have a "permanent disability" and thus was ineligible.  The RRDS offered no further clarification despite Mr. Smith's request.

143.    Defendant VNA failed to send Mr. Smith any written notice of decision regarding his ineligibility or his right to a fair hearing to challenge the denial.

144.    Approximately one month later, Defendant VNA returned to Split Rock and re-assessed Mr. Smith for the NHTD waiver program.  During the interview in August 2015,

Defendant VNA informed Mr. Smith that he was found to be probably eligible for the program once more.

145.    In November or December 2015, All Metro Health Care ("All Metro") offered Mr. Smith service coordination services and assigned him a Service Coordinator.  This Service Coordinator failed to provide any assistance to Mr. Smith other than contacting him to introduce herself, advise him that All Metro had no staff to look for housing and later, in January 2016, alert him of her last day of employment at All Metro.

146.    During the intervening years, Mr. Smith had little to no contact from All Metro, despite his repeated outreach efforts.  In 2017, All Metro finally provided Mr. Smith with a new Service Coordinator to replace the one who left in January 2016.  The new Service Coordinator met with Mr. Smith in September 2017 but, similarly, failed to maintain consistent contact resulting in Mr. Smith's continued institutionalization and inability to transition back to the community.

147.    Although Defendant VNA made two probable eligibility determinations for Mr. Smith in both 2012 and 2015, respectively, he never received any benefits through the NHTD waiver program.

**Marcella Urban**

148.    Marcella Urban is a seventy-one-year-old resident of Brookhaven Rehabilitation and Health Care Center in Queens, New York ("Brookhaven"), where she has lived for approximately ten years.  Brookhaven is a skilled nursing facility that provides both long and short-term care for middle-aged and older adults who require assistance in a homelike setting.

149.    Ms. Urban has severe rheumatoid arthritis which impairs her ability to walk, balance, and grip with her fingers.

150.    Due to her disability, Ms. Urban needs assistance with activities of daily living, such as bathing, using the bathroom, walking, cleaning, and cooking.

151.    Ms. Urban wants to live in the community and could do so with the appropriate home- and community-based supports.

152.    In March 2014, Ms. Urban contacted MFJ for assistance with transitioning to the community.  Soon after, MFJ provided Ms. Urban with information about the NHTD waiver program and instructions on how to apply.

153.    With the assistance of Brookhaven's social worker, Ms. Urban applied for the NHTD waiver program in Spring 2014.  Shortly thereafter, Brookhaven's social worker informed Ms. Urban that the RRDS determined that she was eligible to participate in the program.

154.    Shortly after this determination, Ms. Urban and Brookhaven's social worker began contacting Service Coordinators to assist her with completing her formal application to receive benefits through the NHTD waiver program.

155.    In Summer 2014, Ms. Urban was able to locate a Service Coordinator. Over a year later, Ms. Urban had yet to view any apartments or have consistent contact with her Service Coordinator to facilitate her transition back into the community.

156.    In late August 2015, an individual named Daphne visited Ms. Urban at Brookhaven and stated that she worked in the NHTD waiver program.  Daphne advised Ms. Urban that Defendant VNA had terminated her from the NHTD waiver program but failed to

notify Defendant DOH, Brookhaven and Ms. Urban.  Daphne directed Ms. Urban to select a new service coordination organization.

157.   Ms. Urban selected Any-Time Home Care, Inc. as her new service coordination organization.  Although a representative from Any-Time Home Care, Inc. met with Ms. Urban in person, they declined to provide her with services.  Daphne, once more, directed Ms. Urban to choose another service coordination organization.

158.   Eventually, All Metro agreed to provide service coordination services to Ms. Urban.  However, to date, Ms. Urban has yet to transition to the community with NHTD waiver program services.

159.   Although Defendant VNA made a determination that she was an eligible participant, Ms. Urban has yet to receive any benefits through the NHTD waiver program.

**Sharan Harper**

160.   Sharan Harper is a sixty-seven-year-old resident of Brookhaven, where she has lived for approximately three years.

161.   Ms. Harper has extensive musculo-skeletal conditions and uses a wheelchair and walker.  Due to her disabilities, Ms. Harper needs assistance with activities of daily living, such as ambulating, bathing, cooking, cleaning, shopping, and laundry.

162.   Ms. Harper wants to live in the community and could do so with the appropriate home- and community-based supports.

163.   In October 2016, an attorney from the Legal Aid Society requested an application for the NHTD waiver program from Defendant VNA.  Ms. Harper did not receive the application until a month later, when Defendant VNA emailed it after her attorney reached out to the organization a second time.  Ms. Harper completed the referral form and submitted it in

38

December 2016.  In January 2017, Defendant VNA conducted an intake interview, during which the assessor advised Ms. Harper that she could keep her Managed Long-Term Care Plan for the time being, but would have to disenroll when she was ready for discharge from the nursing home.  Ms. Harper never received a notice regarding her probable eligibility decision, but at her intake interview, Defendant VNA gave her the name of a service coordinator at Heavenly Hands to contact to proceed.

164.    Ms. Harper was able to speak to the service coordinator by phone twice, but both times she was told that the service coordinator was busy and would call her later.  She never heard from them and her voicemails were never returned.

165.    Ms. Harper reported her experience to Defendant VNA and asked for a different service coordinator.  Defendant VNA referred her to All Metro.

166.    All Metro informed Ms. Harper that they only assist participants in the TBI waiver, not the NHTD waiver, and referred her to Quality Services for Independent Living ("Quality").

167.    Ms. Harper repeatedly called Quality.  The receptionist suggested she call a different service coordinator from the list.  Ms. Harper had not been given a list, so she called Defendant VNA again to request a list.  On the call, Defendant VNA suggested three other service coordinators: Greater New York Home Care ("Greater New York"), the Head Injury Association, and City Choice Home Care Services ("City Choice").  Subsequently, on or about February 2, 2017, Defendant VNA emailed Ms. Harper a list of service coordinators.  In its email, it recommended that Ms. Harper try Tri-Boro Home Care, Ltd ("Tri-Boro").

168.    Ms. Harper called the three agencies VNA recommended in the call and the agency it recommended by email.  Greater New York told her that it does not provide service

39

coordination for the NHTD program.  City Choice said they did not have anyone available.  The Head Injury Association did not return calls.  Tri-Boro repeatedly promised that Ms. Harper would get a call the following week, but she never did.

169.    On or about March 7, 2017, Ms. Harper followed up with Defendant VNA, indicating that she had called many service coordinators without success.  She continued calling agencies from the list, working her way down to "V", through the Spring of 2017.

170.    When she finally reached the Head Injury Association, it reported that it did not have anyone available to serve her case.

171.    After many calls, Ms. Harper spoke to a second person at Quality, who told her the agency would not be taking new cases until June.  When she followed up in June, the agency told her they were not taking any cases and again suggested she try other agencies.

172.    One of the agencies, Central Home Care, visited Ms. Harper and told her they could not help her.

173.    Ms. Harper contacted the Gloria B. Rose Center for Children ("Rose Center"), but was told that the organization was in the process of hiring a new service coordinator.  Finally, in July 2017, she was visited by someone from the agency and signed up for services.  She then informed Defendant VNA that the Rose Center would be her service coordinator.

174.    On or about July 27, 2017, Defendant VNA responded by email.  That message asked if Ms. Harper had received VNA's letter saying that, because she had not selected a service coordinator quickly enough, Defendant VNA had closed her case.  She had not received such a letter.  The email was the first she had heard that her case was closed.  She has still not received that letter.

40

175.   Ms. Harper responded that she would reapply, and on or about August 1, 2017, she resubmitted her application.

176.   On or about August 2, 2017, Defendant VNA visited Brookhaven and Ms. Harper signed once more the forms that she had previously signed at the January 2017 intake interview.

177.   On or about August 4, 2017, Defendant VNA called Ms. Harper and told her that she was ineligible for the NHTD waiver program because she was enrolled in a Medicaid Managed Long-Term Care Plan.  Ms. Harper explained, as she had in January 2017, that she had to be enrolled in that plan because Brookhaven was in its network, but that she would disenroll upon discharge from the facility.

178.   This call was followed by a written letter from Defendant VNA, not on letterhead, informing her of her ineligibility and referring her to a different housing program. The notice provided no information about her appeal rights.

179.   On or about August 7, 2017, Ms. Harper was copied on a message from Defendant VNA to her chosen service coordinator, indicating that they had agreed to take her case.  Ms. Harper responded seeking clarification from Defendant VNA, but has not received any answers.

### FACTUAL ALLEGATIONS ABOUT THE PROPOSED CLASS

180.   Named Plaintiffs bring this action, pursuant to Fed. R. Civ. P. 23(a), (b)(1), and (b)(2), on behalf of two subdivisions of classes defined as:

> Class A:  All New York City residents who, since August 18, 2012, have been, or are, recipients of Medicaid coverage that supports community-based long-term care services; have been assessed to need a nursing home level of care; are over the age of eighteen; and who have applied, are applying, or will apply for services under the NHTD waiver program and have been found

41

ineligible for the program at the intake interview stage, and thus, unable to apply to the program, and/or who were initially told that they were probably eligible and whose probable eligibility determination has been revoked, without receiving adequate notice of the reasons for the finding or of their right to a fair hearing to challenge the determination.

Class B:   All New York City residents who, since August 18, 2012, have applied, are applying, or will apply for services under the NHTD waiver program and have been or will be found eligible for the program, but who have been or will be denied reasonably prompt medical assistance in the most integrated setting appropriate through the program, despite their eligibility.

181.    The proposed class is so numerous that joinder of all class members in this action would be impracticable.  Upon information and belief, there are thousands of individuals in this class.  In New York City, there are approximately 263,000 seniors and people with disabilities enrolled in Medicaid.  New York State Department of Health, *Number of Medicaid Enrollees by Category of Eligibility by Social Service District - Calendar Year 2013*, *(available at* http://www.health.ny.gov/statistics/health_care/medicaid/eligible_expenditures/el2013/2013-cy_enrollees.htm).  Approximately 103,500 New York State residents live in nursing homes.  The Kaiser Family Foundation, *Total Number of Residents in Certified Nursing Facilities in 2016*, *(available at* http://kff.org/other/state-indicator/number-of-nursing-facility-residents/).  Thousands of New York City residents are at risk of entering nursing homes.  *See, e.g.,* Center for Independence of the Disabled, New York, *Disability Matters—Unequal Treatment and the Status of People with Disabilities in New York City and New York State*, at 7–10 (*available at* https://www.cidny.org/wp-content/uploads/2017/07/Disability-Matters-1.pdf) (finding that more than 800,000 New Yorkers have disabilities).

182.    In addition, joinder is impracticable because the class is isolated from the community as a result of Defendants' failure to properly administer the NHTD waiver program

42

and many members of the class are without the means to retain an attorney to represent them in a

civil rights lawsuit.  There is no appropriate avenue for the protection of the class members'

constitutional and statutory rights other than a class action.

183.    The claims of the Named Plaintiffs are typical of the claims of the class,

and there are common questions of law and fact.  Common questions of law and fact

predominate, including but not limited to:

(i)     whether Defendants' denial or revocation of eligibility to participate in the NHTD waiver program deprives Plaintiffs of a property interest without due process of law;

(ii)    whether Defendants have failed to provide services through the NHTD waiver program to eligible individuals in a reasonably prompt manner in violation of the Medicaid Act;

(iii)   whether Defendants' failure to properly administer the NHTD waiver program deprives eligible individuals with disabilities of their right to receive services in the most integrated setting appropriate to their needs in violation of the Americans with Disabilities Act and the Rehabilitation Act.

184.    The Named Plaintiffs will adequately and fairly protect the interests of all

members of the proposed class because they have the requisite personal interest in the outcome

of this litigation and have no interest adverse to any members of the proposed class.

185.    Like the other members of the class, the Named Plaintiffs have been and

will be victims of Defendants' failure to administer the NHTD waiver program in accordance

with their constitutional and statutory rights.  In addition, the legal theories under which the

Named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which

all members of the class will rely.

186.    Counsel for the Named Plaintiffs will be able to provide adequate and

appropriate representation to the class in this litigation.  MFJ is experienced in complex class

action litigation, including on behalf of individuals with disabilities in New York City.  Patterson

Belknap Webb & Tyler LLP is also experienced in complex class action litigation, including litigation on behalf of vulnerable individuals.

187.    A class action is the superior method for a fair and efficient adjudication of this matter because Defendants have acted in a manner generally applicable to the entire class. Moreover, a class action will avoid numerous separate actions by class members that would unduly burden the courts and create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate for the class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Claims on Behalf of Named Plaintiffs, and of Class A Members, Pursuant to 42 U.S.C. § 1983 Against Defendants Zucker and VNA for Violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution**

188.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 187 as if set forth in their entirety here.

189.    The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides that a state shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.

190.    Defendant Zucker's and Defendant VNA's denial of Plaintiffs' eligibility for the NHTD waiver program without adequate written notice of the reason for the decision and without apprising Plaintiffs of their rights to a fair hearing deprives Plaintiffs of a property interest without the process guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

191.    Defendant Zucker's and Defendant VNA's revocation of previously granted probable eligibility determinations for the NHTD waiver program from qualified Plaintiffs without adequate written notice of the reason for the decision and without apprising

44

Plaintiffs of their rights to a fair hearing deprives Plaintiffs of a property interest without the process guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

192.    Plaintiffs have suffered harm due to Defendants' violation of their rights under the Due Process Clause of the Fourteenth Amendment.  This harm includes but is not limited to Plaintiffs' failure to obtain benefits to which they are entitled, resulting in their unnecessary and prolonged institutionalization and isolation from their communities.

193.    By his acts and omissions, Defendant Zucker has acted under color of state law to deprive Plaintiffs of their rights to procedural due process under the Due Process Clause of the Fourteenth Amendment, and he is therefore liable under 42 U.S.C. § 1983.

194.     By its acts and omissions, Defendant VNA has acted under color of state law to deprive Plaintiffs of their rights to procedural due process under the Due Process Clause of the Fourteenth Amendment, and it is therefore liable under 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION**
**Claims of Named Plaintiffs, and of Class B Members, Pursuant to 42 U.S.C. § 1983 Against Defendants Zucker and VNA for Violations of The Medicaid Act**

195.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 187 as if set forth in their entirety here.

196.    Pursuant to the Medicaid Act, a state's Medicaid plan must "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8).

197.     By allowing eligible applicants to wait months, and in some cases years, before receiving benefits through the NHTD waiver program, Defendants Zucker and VNA have violated Plaintiffs' right to receive Medicaid benefits with "reasonable promptness."

198.     Section 1396(a)(8) confers on eligible individuals a federal right to receive benefits that may be enforced in an action brought pursuant to 42 U.S.C. § 1983.  *M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 428 (S.D.N.Y. 2006); *Alexander A. v. Novello*, 201 F.R.D. 27, 35 (E.D.N.Y. 2002).

199.     Defendants Zucker and VNA violate Plaintiffs' right to receive Medicaid benefits with "reasonable promptness" by failing to ensure that there are adequate resources to administer the program, including but not limited to an adequate number of Service Coordinators to assist Plaintiffs with their formal applications.

200.     Plaintiffs have suffered harm due to Defendant Zucker's and Defendant VNA's violation of their rights under the Medicaid Act.  These harms include but are not limited to Plaintiffs' failure to obtain benefits to which they are entitled, resulting in their unnecessary and prolonged institutionalization and isolation from their communities.

201.     By his acts and omissions, Defendant Zucker has acted under color of state law to deprive Plaintiffs of their rights to receive Medicaid benefits to which they are legally entitled with "reasonable promptness," and he is therefore liable under 42 U.S.C. § 1983.

202.      By its acts and omissions, Defendant VNA has acted under color of state law to deprive Plaintiffs of their rights to receive Medicaid benefits to which they are legally entitled with "reasonable promptness" under the Medicaid Act, and it is therefore liable under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION

**Claims of Named Plaintiffs, and of Class B Members, Against Defendants DOH and Zucker Pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.***

203.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 187 as if set forth in their entirety here.

204.    Title II of the ADA prohibits discrimination against individuals with disabilities in accessing public services:  "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

205.    The ADA further mandates that public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

206.    In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the United States Supreme Court recognized that "unjustified isolation . . . is properly regarded as discrimination based on disability," and that a private right of action exists for failure to place an individual in the most integrated setting appropriate to his or her needs.

207.    Defendant DOH, of which Defendant Zucker is the Commissioner, is a public entity within the meaning of the ADA.  42 U.S.C. § 12131(1)(A).

208.    Plaintiffs are qualified individuals with physical and mental disabilities, including but not limited to high blood pressure, severe rheumatoid arthritis, the inability to ambulate, and blindness.

209.    All individuals who are eligible to participate in the NHTD waiver program are disabled within the meaning of the ADA.

210.     By failing to provide adequate resources to administer the NHTD waiver program, Defendants DOH and Zucker deprive Plaintiffs of their legal right to receive public benefits in the most integrated setting appropriate to their needs and leave Plaintiffs languishing in nursing homes for months, and in some cases years.

211.     Plaintiffs have suffered harm due to Defendant DOH's and Defendant Zucker's violations of their rights under the ADA.  This harm includes but is not limited to unnecessary and prolonged institutionalization and isolation from their community.

**FOURTH CAUSE OF ACTION**
**Claims of Named Plaintiffs, and of Class B Members, Against Defendants DOH and VNA Pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a)**

212.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 187 as if set forth in their entirety here.

213.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), states:  "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

214.     Section 504 further mandates that public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 41.51(d)

215.     In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the United States Supreme Court recognized that "unjustified isolation . . . is properly regarded as discrimination based on disability," and that a private right of action exists for failure to place an individual in the most integrated setting appropriate to his or her needs.

48

216. Defendant DOH receives federal financial assistance to finance and administer the NHTD Medicaid waiver program. *See* 29 U.S.C. § 794(a).

217. Defendant VNA receives federal financial assistance to finance and administer the NHTD Medicaid waiver program. *See* 29 U.S.C. § 794(a).

218. Plaintiffs are qualified individuals with physical and mental disabilities that substantially limit one or more major life activities.

219. All individuals who are eligible to participate in the NTHD waiver program are disabled within the meaning of the Rehabilitation Act.

220. By failing to provide adequate resources to administer the NHTD waiver program, Defendants DOH and VNA deprive Plaintiffs of their legal right to receive public benefits in the most integrated setting appropriate to their needs and leave Plaintiffs languishing in nursing homes for months, and in some cases years.

221. Plaintiffs have suffered harm due to Defendant DOH's and Defendant VNA's violations of their rights under Section 504 of the Rehabilitation Act. This harm includes but is not limited to unnecessary and prolonged institutionalization and isolation from their community.

## **PRAYER FOR RELIEF**

FOR ALL OF THESE REASONS, Plaintiffs respectfully ask this Court to order the following injunctive and/or declaratory relief:

1. Declare that Defendants' policies and practices violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the Medicaid Act, the ADA, and Section 504 of the Rehabilitation Act, as set forth herein.

49

2.     Enter a permanent order requiring Defendants to provide access to benefits through the NHTD waiver, including, among other things, access to Service Coordinators and integrated housing, with reasonable promptness.

3.     Enter a permanent order requiring Defendants to ensure that there are adequate resources for the administration of the NHTD waiver program, including, among other things, an adequate number of Service Coordinators and adequate integrated housing opportunities, to meet the needs of all eligible NHTD waiver applicants within the waiver enrollment cap.

4.     Enter a permanent order requiring Defendants to provide services to qualified NHTD waiver applicants in the most integrated setting appropriate to their needs.

5.     Enter a permanent order requiring Defendants to provide written notice of eligibility determinations to NHTD waiver applicants, including a description of the reasons for the decision, the evidence relied on in reaching that determination, and information regarding the applicant's right to a fair hearing and the steps necessary to pursue that right.

6.     Enter a permanent order requiring Defendants to provide written notice of the revocation of probable eligibility determinations to NHTD waiver applicants, including the reasons for the decision and information regarding the applicant's right to a fair hearing and the steps necessary to pursue that right.

7.     Enter an award of Plaintiffs' attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205; 29 U.S.C. § 794(a); and,

8.     Grant such other and further relief as the Court deems equitable and just.

Dated:  May 22, 2019
        New York, New York

50

By: _____

Jeanette Zelhof
Kevin M. Cremin
Orier Okumakpeyi
Daniel A. Ross

Mobilization for Justice, Inc.
100 William Street, 6th Floor
New York, NY 10038
(212) 417-3700


*Attorneys for Michelle Bagley;*
*Gary Milline; Hamilton Smith;*
*Marcella Urban; Sharan*
*Harper; and other similarly*
*situated individuals*

By: _____

Michael F. Buchanan
Jesse A. Townsend
Jacqueline L. Bonneau

PATTERSON BELKNAP
WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000


*Attorneys for Michelle Bagley;*
*Gary Milline; Hamilton Smith;*
*Marcella Urban; Sharan*
*Harper; and other similarly*
*situated individuals*

51